Filed 6/21/23  P. v. Carr CA5

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>        v.<br><br>MICHAEL PATRICK CARR,<br><br>    Defendant and Appellant. | F083650<br><br>(Super. Ct. No. F17906850)<br><br><br>**OPINION** |

-ooOoo-

APPEAL from a judgment of the Superior Court of Fresno County.  Alvin M. Harrell, III, Judge.

Mugridge Law Firm, David R. Mugridge and Shannon Wentworth, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, Louis M. Vasquez, Kari Mueller, Amanda D. Cary and William K. Kim, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

## **INTRODUCTION**

In one consolidated case, appellant Michael Patrick Carr was charged with 14 counts arising from three separate incidents.  He plead not guilty by reason of insanity.  Following a jury trial, Carr was found legally insane during the commission of two counts; the jury was unable to reach a unanimous verdict on the 12 remaining counts.  The trial court declared a mistrial on those 12 counts, and Carr was retried pursuant to a bench trial.

The trial court found that Carr was legally insane during the commission of some of the offenses, but sane as to others.  He was sentenced to an aggregate determinate term of 18 years in state prison.  Because Carr's sanity had not been restored at the time of sentencing (see Pen. Code,[1] § 1026.2), the trial court committed him to the Department of State Hospitals and stayed his prison sentence pending restoration of his sanity.

Carr raises multiple claims on appeal.  First, he contends that trial counsel rendered ineffective assistance of counsel.  He argues, *inter alia*, that trial counsel erred by failing to declare a doubt as to his competency to stand trial (§ 1368).  In the alternative, Carr submits that the trial court abused its discretion by failing to investigate his competency.  Second, Carr asserts that the trial court erred by declaring a mistrial without having requested testimony readback to the jury, and that the court erred by permitting the jurors to rely upon their notes in place of a readback of testimony.  Third, he claims that resentencing is required by Assembly Bill No. 124 (2021-2022 Reg. Sess.) (Assembly Bill No. 124), which was enacted during the pendency of his appeal.  Finally, Carr contends that the cumulative effect of these errors necessitates reversal of his conviction.

---

[1]     All undefined statutory citations are to the Penal Code unless otherwise stated.

2.

The Attorney General concedes that resentencing is required following the enactment of Senate Bill No. 567 (2021-2022 Reg. Sess.) (Senate Bill No. 567), but submits that Carr's remaining claims are meritless.

We accept the Attorney General's concession that resentencing is required following the enactment of Senate Bill No. 567.  In light of our conclusion, Carr's claim that resentencing is required pursuant to Assembly Bill No. 124 is moot and we do not address it.  We further conclude that the remainder of Carr's claims are without merit and therefore affirm the judgment.

## PROCEDURAL HISTORY

On August 9, 2018, the Fresno County District Attorney filed a consolidated information charging Carr with the following crimes:  assault with a deadly weapon (§ 245, subd. (a)(1), count 1); criminal threats (§ 422, count 2); false imprisonment by violence (§ 236, count 3); criminal threats (§ 422, count 4); dissuading a witness from reporting a crime (§ 136.1, subd. (b)(1), count 5); possession of a firearm by a felon (§ 29800, subd. (a)(1), count 6); possession of ammunition by a person prohibited from owning a firearm (§ 30305, subd. (a)(1), count 7); corporal injury to spouse or cohabitant (§ 273.5, subd. (a), count 8); assault by means of force likely to produce great bodily injury (§ 245, subd. (a)(4), count 9); misdemeanor cruelty to child by inflicting unjustifiable physical pain or mental suffering (§ 273a, subd. (b), count 10); battery resulting in serious bodily injury (§ 243, subd. (d), count 11); assault with a deadly weapon (§ 245, subd. (a)(1), count 12); criminal threats (§ 422, count 13); and vandalism (§ 594, subd. (a), count 14).  The information further alleged that Carr had served four prior prison terms (§ 667.5, subd. (b)), that he was released from custody on bail or own recognizance at the time of the commission of counts 1 through 10 (§ 12022.1), that he personally inflicted great bodily injury upon the victim (§ 12022.7, subd. (a)) in the commission of count 1, and that he had personally used a firearm (§ 12022.5, subd. (a)) in the commission of count 4.

3.

On January 6, 2020, Carr withdrew his plea of not guilty and admitted guilt to all charges and enhancements. He plead not guilty by reason of insanity to all counts. Following a motion by the prosecutor, the trial court struck the four prior prison term enhancement allegations (§ 667.5, subd. (b)).

On January 8, 2020, Carr's jury trial commenced.

On January 23, 2020, the jury began deliberations.

On January 27, 2020, the jury found Carr legally sane on counts 6 and 7 but deadlocked on all remaining counts. The trial court declared a mistrial on these counts.

On April 10, 2020, Carr waived his right to a jury trial on the counts upon which a mistrial was declared and the parties submitted on the evidence received at Carr's jury trial. The parties gave new closing arguments and transcripts of Carr's jury trial and the parties' closing arguments were prepared for the court.

On June 30, 2020, the trial court found Carr sane on counts 1 through 5, and 8 through 10, but legally insane on counts 11 through 14, and therefore, not guilty by reason of insanity.

On October 13, 2021, the trial court conducted an evidentiary hearing to determine whether Carr had been restored to sanity (§ 1026.2). The court found Carr to be currently insane based on the opinion of the court-appointed experts, Dr. Doriann Hughes and Dr. Tamar M. Kenworthy, and trial counsel's experts, Dr. Mary Gable and Dr. Patricia A. Santy.

On November 5, 2021, due to the legal insanity verdict, and the trial court's conclusion that Carr had not been restored to sanity, the trial court committed Carr to the Department of State Hospitals for treatment. As to the counts upon which Carr was found to be legally sane, the court imposed a total determinate prison sentence of 18 years. The court stayed Carr's prison sentence pending restoration of his sanity.

Carr filed a timely notice of appeal.

## STATEMENT OF FACTS

**The Underlying Incidents**

    **1.**      *The Domestic Violence Incident Against S.Y. (July 17, 2017)*

S.Y. and Carr were in a dating relationship and had lived together from May 2015 until October 2017. They share two children together.

In July 2017, the couple had been arguing. Carr claimed that for months, someone had been writing hidden messages on the walls of his home and that people were secretly living in the home. He was convinced that S.Y. was sneaking people into their home to have sex with them.

On July 17, 2017, exasperated by Carr's delusions, S.Y. decided to leave him. She placed her newborn daughter in her car seat and held her other daughter's hand. S.Y. told Carr, " 'I'm leaving you, and you know the reasons why.' " She began to walk down the street. Carr asked her to come back, and a verbal confrontation ensued.

S.Y. went to a neighbor's house, so she could use their telephone. Carr followed her. He struck S.Y. in the face chipping her tooth and causing her nose to bleed.

A Ring doorbell recorded the incident. The video showed that after he struck S.Y., Carr told her, " 'You need to come back. You need to clean yourself up. You're causing a scene.' " Carr took the car seat with the baby inside and walked home. When law enforcement responded to the incident, Carr denied that any physical altercation had occurred.

    **2.**      *The Assault on the Gardeners (June 27, 2017)*

A.J. and his brother M.J. worked as gardeners. On the morning of June 27, 2017, A.J., M.J. and A.J.'s son, Alex, went to Carr's rented home to do some landscaping. Carr came out of the house and asked A.J., "if [he] was the owner for the work." A.J. responded affirmatively. Carr grabbed A.J. and started to beat him with his fists. A.J. backed away, and asked Carr, " '[w]hy are you hitting me?' " Carr claimed A.J. "had gone by in the evening to see [Carr's] wife."

Carr chased A.J. around a truck several times, repeatedly asking A.J. whether he had gone to see Carr's wife. At some point, Carr, put his hand into his left pocket, and threated to fillet and kill A.J. A.J. fled across the street. Carr followed and continued to demand A.J. answer whether or not he "had gone to see [Carr's] mother fucking old lady." He sucker punched A.J., knocking him to the ground and causing him to lose consciousness.[2]

At some point, M.J. grabbed A.J.'s lawn edger, which was lying on the ground. He told Carr to calm down and instructed Alex to call the police. Carr threatened to kill them if they called the police. As Carr came toward M.J., he threatened, " 'I'll fuck you up.' " M.J. cut Carr with the edger. Carr took the edger away from M.J. and cut M.J. with it, injuring him. Carr then threw M.J. onto the cement.

The physical confrontation ultimately ended when Carr attempted to use A.J. and M.J.'s lawnmower to cut up some cement figurines. Carr picked up the lawnmower and threw it, damaging it.

When officers responded to the incident, Carr claimed that he had gone outside to confront the gardeners because they were having sexual intercourse with his wife. Carr claimed he was attacked first. Carr appeared agitated and paranoid. He would not initially open the screen door to speak with police because he was concerned about being arrested. Carr did however show the responding officers video recorded on his cellular phone which he claimed, supported his belief that the men were sleeping with Carr's wife. The video showed nothing. The responding officers placed a section 5150 psychiatric hold on Carr so that he could be evaluated for whether he was a danger to himself or others.

---

[2]     A.J. and M.J.'s testimony differed with respect to the precise sequence of events during the fight.

On June 27, 2017, Natalie Arballo, a licensed clinical social worker, evaluated Carr pursuant to the section 5150 hold. During the examination, Arballo noted that Carr was "cooperative" and "calm," and his thought process was "logical," "coherent," and he was "fully oriented." Carr denied any suicidal ideation, he (falsely) denied having a psychiatric history or being under the influence of any substances. A toxicology report showed that Carr had methamphetamine in his system, as well as amphetamine and THC.

According to Arballo, Carr was able to understand her questions, to answer them appropriately, and to stay focused. Carr also had insight into why he was at the hospital. Carr claimed that he had gotten into a physical altercation after confronting the gardeners about sleeping with his wife. Arballo concluded that despite Carr having some paranoia, he was not a danger to himself or others, nor was he gravely disabled. Carr was released to the custody of the Fresno Police Department.

### 3. *Restraining and Assaulting R.D. (November 16, 2017)*

After Carr's relationship with S.Y. ended, he began a semi-platonic relationship with R.D. On November 16, 2017, Carr asked R.D. to come over to help him clean up a mess. Carr had shot his dog four days prior after his dog bit him. R.D. stated that Carr was acting paranoid.

Carr and R.D. consumed vodka and orange juice together. At one point, R.D. came out of the restroom and noticed that all of the windows in the house had been covered and that Carr had removed keys from the deadbolt locks on the front and back doors.

They smoked methamphetamine together. At some point thereafter, Carr asked her to have a seat and gave R.D. a cigarette. He told her that he was "going to fuck [her] up or beat [her] ass because he felt like [she] was lying to him about certain things." Carr told R.D. that he did not trust her and that "it was time for [her] to feel it." Carr appeared angry and crazy. He made it known that he had a gun on his hip.

Carr believed that R.D. was letting people into the house when he was not present so that they could go into the attic to have sex with Carr's wife. Carr told R.D., " 'We're going to finish this cigarette and when we're done … I'm going to turn up the stereo and I'm going to start.' " He explained that he was going to turn the stereo up so "nobody could hear [her scream]." Carr turned the stereo up as loud as possible.

Carr walked toward R.D., stood in front of her, and with a closed fist, punched her three times on the chest and rib cage. He picked her up by her shirt and threw her onto the ground where she landed face down.

Carr demanded R.D.'s cellular phone and the personal identification number to unlock it. He hogtied R.D. with duct tape and duct taped her mouth shut. Carr spent over an hour searching through R.D.'s phone as she was lying on the floor, hogtied. Although he was unable to find evidence showing that R.D. was plotting against him, he still suspected her of wrongdoing and told her he was "going to fuck [her] up."

Carr untied R.D. and allowed her to get up. They ate together and acted as if nothing had happened. However, after another hour or so, Carr said something to the effect of, " 'Let's get ready. We're going to do this again … because I'm not done with you.' " The stereo was still at full volume.

Carr began yelling at R.D. claiming that she was being dishonest and that she was not telling him where certain individuals were that he was looking for. At some point, Carr removed a firearm from his waistband and told her either, " 'You're lucky I don't kill you' " or " 'I should kill you.' " He discharged bullets into the ceiling. R.D. stated that she had observed Carr discharge the firearm into the ceiling on prior occasions, believing that somebody was in the attic.

Carr went into another room and came back out with a club. He told R.D., " 'This is what you're going to get next.' " He swung the club back and forth.

Carr swung the club downward and struck R.D.'s thigh/kneecap. Another time, he struck her hand when she tried to block the club with her hand. A third time, he struck

her over the head, breaking the club. R.D. heard a loud " 'pow' " sound, saw a big white flash, and felt warm fluid dripping down on her. The blow to her head left a laceration, causing her to bleed. Carr wrapped some type of clothing around R.D.'s head.

R.D. walked into another room, lied down on a couch, and fell asleep. At some point, Carr woke her up. He asked R.D. if she wanted to go home. She responded affirmatively. Carr told her not to inform the police about what happened and to blame "Mouse," the person who had introduced them, for her injuries. He told R.D. that if she said anything, he would not be able to see his children anymore and that he already had a case against him for hurting somebody else. R.D. fled in her vehicle as Carr was inside the home locking up.

Two days later, R.D. was taken by ambulance to the hospital. Over the course of four or five days, she was treated for a punctured lung, broken ribs, a fractured eye socket, two broken fingers, a laceration to the head, a black eye, and bruising all over her body. R.D. was also diagnosed with post-traumatic stress disorder.

On November 20, 2017, Carr was arrested. During the course of the arrest, Carr initially fled from the police.

**Expert Opinions as to Carr's Sanity During the Charged Offenses**

**1. The Defense Experts**

*a. Dr. Kathleen Sullivan*

Dr. Kathleen Sullivan offered testimony concerning Carr's psychiatric history. She testified that she has a PhD in clinical psychology, she is board certified as a child and adolescent psychologist, and has been licensed since 1982. She began treating Carr when he was approximately 11 years old, when he was hospitalized at an inpatient psychiatric treatment facility for children.

9.

Dr. Sullivan described Carr as "a very difficult" and "very angry child." She explained that Carr had several hospitalizations after she began treating him because his symptoms were too significant to be addressed on an outpatient basis.

Dr. Sullivan explained that it was difficult to diagnose Carr. During the course of treating him, she discovered that Carr had suffered a brain injury when he was a very young child as a result of an automobile accident. Dr. Sullivan opined that Carr's brain injury was a significant variable in explaining his behavior. She further opined that Carr had a predisposition to attention deficit hyperactivity disorder as a young child, and that his condition was significantly exacerbated by his brain injury.

Following a neuropsychological test, Dr. Sullivan diagnosed Carr with an organic personality disorder and depression. She predicted that as an adult, Carr would have trouble with the law later in life.

### b.     Dr. Avak Howsepian

Dr. Avak Howsepian, a board-certified clinical psychiatrist with an MD and PhD, testified as an expert at a pretrial hearing on trial counsel's request for mental health diversion and at Carr's trial. Dr. Howsepian interviewed Carr in January 2018 and February 2018 pursuant to his evaluation of whether Carr was legally insane during the charged offenses. A copy of Dr. Howsepian's report was submitted with trial counsel's written motion requesting mental health diversion, and the court confirmed that it had reviewed the report "in depth."

Dr. Howsepian stated that Carr had experienced hallucinations when he was about 12 years old, urging him to do certain things. And, although Carr had previously taken psychiatric medication, he had stopped taking his medication when he was 18 years old. Dr. Howsepian agreed with a prior assessment by Dr. Sullivan that if Carr stopped taking his psychiatric medication, or if he mixed his prescribed medications with illicit substances, the outcome would be "frightening."

Dr. Howsepian diagnosed Carr with an unspecified psychotic disorder that was most likely a "mixed type" of delusional disorder. According to Dr. Howsepian, the traumatic brain injury Carr had sustained when he was five years old also caused him to experience a personality change, compromising his ability to accurately perceive reality. Following his evaluation, Dr. Howsepian believed Carr had psychosis caused by a delusional disorder, schizophrenia, or a settled psychosis due to a prolonged history of methamphetamine use.

At trial, Dr. Howsepian opined that Carr was legally insane during the commission of all three incidents. He explained that a sanity evaluation required him to determine whether the subject (1) has a mental disease or disorder at the time the crime occurred; (2) he or she was incapable of knowing or understanding the quality of his or her act; or (3) whether because of that disease or defect, he or she was incapable of knowing or understanding that his act was morally or legally wrong.

Although Carr understood the nature and quality of his actions, he was incapable of understanding that his actions were morally wrong. Dr. Howsepian explained that Carr was psychotic at the time of the charged offenses, meaning he was delusional.[3] Carr claimed that there were hidden messages on his mirror and his bedroom that were written in deodorant or soap and that he occasionally heard voices in his attic. He further claimed he had video evidence supporting his belief that S.Y. was having sexual intercourse with various individuals and that on a few occasions, he had heard voices coming from his attic. Carr's actions were motivated by his delusions about S.Y. having multiple affairs, causing him to believe that his actions were justified, and therefore, morally correct.

---

**3**     In his written report, Dr. Howsepian opined that Carr was still psychotic.

### c.    Dr. Allan Hedberg

Dr. Hedberg received his PhD in clinical psychology in 1969 and has been practicing as a clinical psychologist since that time. Dr. Hedberg interviewed Carr in November 2018 and December 2018 to evaluate whether he was legally insane during the commission of the charged offenses. He did not prepare a written report following his evaluation, but he did document his interview with notes.

Dr. Hedberg diagnosed Carr with a psychotic disorder due to a medical health condition and drug use. He specifically diagnosed Carr with schizophrenia. Dr. Hedberg opined that Carr was schizophrenic as early as 10 or 12 years old, and that Carr's drug use exacerbated his mental health issues, including his delusions. According to Dr. Hedberg, Carr suffers from a form of schizophrenia marked by delusions and paranoia which causes him to perceive information in a distorted way.

Dr. Hedberg opined that Carr was legally insane when he attacked the gardeners and when he hogtied and beat R.D. Although Carr knew he was involved in a physical altercation, his motive for attacking the gardeners and restraining and beating R.D. was based upon a delusional belief. Dr. Hedberg explained that at the time of these crimes, Carr may have understood right from wrong legally, but he could not distinguish between right and wrong morally. He may have felt justified in his actions based on his delusional belief that S.Y. was having multiple affairs.

However, with respect to Carr's attack on S.Y., Dr. Hedberg opined that Carr was sane during the commission of that incident. Dr. Hedberg explained that Carr's thoughts and actions were reasonable; he was attempting to prevent S.Y. from taking their infant daughter outside on a very hot day, and in Carr's view, S.Y. was not properly equipped to care for her. Carr likely believed he was acting in the best interests of his daughter. According to Dr. Hedberg, Carr understood that it was both morally and legally wrong to strike S.Y., despite his mental health disorder and his delusions.

Dr. Hedberg based his opinion on interviews with Carr and reports authored by other doctors who had examined Carr, including, Dr. Terrell, Dr. Willis, Dr. Howsepian, and Dr. Sullivan. Dr. Hedberg did not review the Ring surveillance video depicting Carr's attack on S.Y., nor did he read police reports from any of the incidents. He stated that he had sufficient records from the reports of the other experts who had interviewed Carr. Dr. Hedberg acknowledged that while the Ring video might be significant insofar as it reflects the truth of what had actually transpired, the important consideration was whether Carr's asserted justification for his actions was rational.

### d.        Dr. Mary Ann Yaeil Kim

On January 8, 2020, outside of the presence of the jury venire, the parties discussed the notes of Dr. Mary Ann Yaeil Kim and her anticipated testimony as an expert witness. Dr. Kim was retained by trial counsel to determine whether Carr was sane during the commission of his crimes. However, Dr. Kim's notes stated that the purpose of her evaluation was for "PC 1368, mental competency" and listed issues to be addressed at a competency evaluation.

The portion of Dr. Kim's notes which would be relevant to an evaluation of sanity were left blank, and there was no indication in the notes about what evidence Dr. Kim had reviewed in making her sanity determination. Nor did Dr. Kim's notes contain language consistent with the evaluation of whether Carr suffered from a mental disease or defect at the time of the charged offenses.

The prosecutor requested a hearing pursuant to Evidence Code section 402 to determine whether Dr. Kim was competent to testify as to Carr's sanity at the time of the offenses. Trial counsel did not object.

On January 14, 2020, outside of the presence of the jury, the trial court held an in limine hearing under Evidence Code section 402. At the hearing, Dr. Kim testified that she had obtained her PhD in clinical psychology and has worked as a psychologist for over 30 years. She had also been appointed to conduct psychological evaluations

13.

pursuant to section 1368 anywhere from three to 500 times and had conducted sanity evaluations for insanity claims approximately 15 to 20 times.

Dr. Kim interviewed Carr in November 2018. Although she took notes during her interview, she did not produce a report detailing her evaluation until one week prior to the in limine hearing.

Dr. Kim explained that the purpose of her examination was to determine what Carr's psychological condition was like, and based on that, if asked, she would subsequently render an opinion as to his sanity or competency. Several months prior to Carr's trial, she was asked to opine whether Carr was sane or insane during the commission of his offenses.

Dr. Kim opined that Carr "was insane at the time of the commission of the crime[s]" and that "he is still insane." She explained that Carr's behavior was predicated upon delusional beliefs caused by his mental health issues. Based on his underlying psychosis and delusions, Dr. Kim stated that Carr could not distinguish between right and wrong morally and would never be capable of doing so.

When questioned, Dr. Kim could articulate only one of the legal elements underlying the determination of whether someone is sane or legally insane: whether at the time of the offense, the person understood right from wrong. Although she represented that her opinion that Carr was legally insane at the time of his crimes was based upon "the legal standard," she did not cite that standard in her report, nor did she document any statements Carr had made during her interview.

In making her determination, Dr. Kim reviewed police reports involving the underlying incidents. However, she was not provided with the Ring video depicting the domestic violence incident, so she did not watch the video.

Dr. Kim testified that while a video depicting the crime would "add value," it would not change her professional opinion. She further claimed that the fact that Carr had lied to the police after the domestic violence opinion, specifically, by denying that he

14.

had struck S.Y., would not change her opinion. With respect to the incident involving Carr's attack on the gardeners, Dr. Kim testified that Carr's refusal to come out of his home when law enforcement arrived was not evidence that he had knowingly engaged in criminal wrongdoing.

Dr. Kim acknowledged that the determination of whether someone was competent for purposes of section 1368 was a different type of evaluation from whether they are legally insane. However, in her notes, she had characterized Dr. Terrell's report, which was based upon an evaluation of Carr's sanity (§ 1026), as a "1368 evaluation." Dr. Terrell did not evaluate whether Carr was competent to stand trial. Dr. Kim also mistakenly referred to Dr. Willis's sanity evaluation as a "competency evaluation." Dr. Kim was not asked to determine whether Carr was competent to stand trial under section 1368.

At the conclusion of the hearing, the trial court held that Dr. Kim would be precluded from testifying. The court stated that while Dr. Kim "has outstanding education and experience," she lacked knowledge regarding the elements of legal insanity under section 1026, she refused to consider whether certain evidence would have an impact on her determination, and that she had only a loose understanding of the facts of Carr's case.

Trial counsel requested reconsideration of the trial court's ruling, explaining that the Ring video depicting the domestic violence incident was not indicative of Carr's mental state, and the fact that Carr had lied to the police about striking S.Y. did not mean he was sane. The trial court responded as follows:

> "THE COURT: No, it doesn't, but there are a number of things that were opined by Dr. Kim during the course of this motion in limine that the Court finds -- one of the statements was that he still – he's still insane, where I'm looking right at him, and just his interactions with my court staff, with my deputies, with Counsel, um, it just makes no sense. It does not comport to the elements that we have under 1026. Um, the Court is also cognizant of the – the outline that was provided by Dr. Kim that had

15.

the 1368 elements, and there was nothing in that document that even came close to discussing the elements under Penal Code Section 1026. Again, it's difficult for me to make these comments in front of Dr. Kim because I have a lot of respect for you, ma'am. Obviously you're very educated and you have 30 years experience, but I'm saying in this case, it would be a disservice to the jurors, because I believe there would be more of a confusion with this information that I heard than any assistance to the jurors in coming to a conclusion whether or not Mr. Carr was insane at the time of these three particular acts. With that being said, the Court is not going to reconsider. I think the Court -- I listened to this, and I was surprised that … [the prosecutor] kept going. I was prepared to pull the trigger long before. I've never done this before, and again, it's not anything negative as to … Dr. Kim, it's as to the preparation for this case, and so that's the Court's ruling."

## 2.     The Court-Appointed Experts

### a.     Dr. Howard Terrell

Dr. Terrell is a licensed medical doctor who holds board certifications in psychiatry and forensic psychiatry. He has served as a court-appointed expert on thousands of occasions since 1986, and he has conducted hundreds of sanity and competency evaluations. Dr. Terrell explained that he was appointed by the court to determine whether Carr was legally insane at the time of his crimes.

Dr. Terrell opined that Carr has had a substance abuse problem going back "many years." Carr stated that he began using methamphetamine at the age of 18 and that he typically consumes between 1.5 to two grams a day. However, he admitted that he has consumed as much as three and a half grams per day. Carr admitted he was using methamphetamine in substantial quantities around the time of his crimes.

Dr. Terrell explained that a methamphetamine habit of this magnitude can have profound psychical, medical, and psychological effects on a person's behavior. He explained that methamphetamine can exacerbate an individual's mental health illness, particularly if they have a predisposition to anger and rage. However, the psychiatric effects from methamphetamine use on someone without a mental health issue can cause them to become mildly aggressive or even homicidal.

16.

Dr. Terrell interviewed Carr in February 2018. He described Carr as "alert," "oriented," and stated that Carr's IQ was average to above average. Although Carr spoke repeatedly about his belief that S.Y. was cheating on him with multiple people, Dr. Terrell concluded that Carr's long-term and short-term memory were functional, and his judgment and insight were "fair."

Dr. Terrell diagnosed Carr with stimulant use disorder, a psychotic disorder due to a medical condition, an unspecified psychotic disorder due to use of methamphetamine, and an unspecified depressive disorder. During the 24-hour period prior to and during the incident in which he hogtied and beat R.D., Carr admitted that he had ingested " '[p]robably an eight ball [(3.5 grams],' " of methamphetamine. Dr. Terrell opined that Carr's ingestion of methamphetamine on the date of each crime explained his violent behavior.

However, Dr. Terrell further opined that despite the fact that Carr is chronically mentally ill and had abused methamphetamine, he knew that his actions were wrong. He explained that although the attack on R.D. was motivated by a psychotic delusion, the fact that Carr attempted to dissuade R.D. from reporting the attack, his acknowledgment of another case pending against him, the concealment of evidence of the crime, and running from the police four days later, support the conclusion that he was criminally minded versus psychotic.

With respect to the domestic violence incident involving S.Y., Dr. Terrell stated that the Ring video supported the conclusion that Carr knew what he was doing was wrong when he struck S.Y. Dr. Terrell observed that when the police responded to the incident just 15 minutes later, Carr had denied striking S.Y. This demonstrated that he understood the wrongfulness of his actions.

Finally, as to the incident wherein Carr attacked two gardeners, Dr. Terrell opined that Carr knew what he was doing during the commission of the crime and that his actions were wrong. Dr. Terrell explained that Carr had offered two justifications for the

17.

crime, one which was consistent with his delusion, and another in which he claimed he had acted in self-defense. Further, when police responded to the incident, Carr refused to open his front door, afraid he would be arrested. Thus, Carr's actions demonstrated that he knew what he had done was wrong, and that he was in trouble.

Dr. Terrell explained that having a mental illness or brain injury does not automatically make someone legally insane, nor does the fact that the person has experienced psychotic delusions. They may still know that a given act is wrong. Similarly, Dr. Terrell opined that even though Carr was a chronically mentally ill person who abused methamphetamine, he knew that his actions during each of the three criminal incidents were both legally and morally wrong.

### b. Dr. Paula Willis

Dr. Willis, a clinical psychologist with over 20 years of experience, was appointed by the court to conduct an evaluation of Carr in 2018. She has served as a panel member of the Fresno County Superior Court as an expert witness since 2001.

Dr. Willis stated that Carr was still delusional at the time of her interview, but he was otherwise "completely oriented," he spoke clearly, and he was intelligent. She described Carr as "polite" and "very cooperative." Carr understood why he was being evaluated, he denied hearing voices at the time of the interview, and he did not exhibit psychotic tendencies.

With respect to whether Carr had a mental disease or defect, Dr. Willis diagnosed Carr with anti-social personality with narcissistic traits and either schizophrenia or a delusional disorder.

Dr. Willis explained that she was suspicious of schizophrenia because Carr had previously admitted to hearing voices. However, according to Dr. Willis, Carr was not experiencing command hallucinations, that is, hallucinations that commanded him to act, during any of the three incidents. She explained that although Carr had claimed that he had heard voices of people hiding in his attic, he admitted he was on methamphetamine at

the time.  Carr also admitted that he had ingested methamphetamine at the time of each incident.

When Dr. Willis interviewed Carr, he was still delusional, but he was not high or under the influence of illicit substances.  This caused her to suspect that he suffered from a delusional disorder.  Based upon Carr's severe head injury, however, Dr. Willis could not make a definitive diagnosis.

Dr. Willis opined that Carr was capable of understanding his actions, and therefore, was not legally insane during all three incidents.  She explained that Carr's mental disorder and his delusions did not automatically render him incapable of knowing right from wrong.

During the domestic violence incident, Carr told S.Y. to " 'Wipe your face off,' " and added, "I don't want anybody to see that," after he struck her.  According to Dr. Willis, Carr understood that striking and injuring S.Y. was therefore both morally and legally wrong.

With respect to the incident wherein Carr attacked the gardeners, Carr made threats which ultimately escalated into physical violence, and after the police responded, he actively avoided them because he did not want to be arrested.  He also falsely told the police that he had acted in self-defense, a claim he had repeated to Dr. Willis during her interview.  According to Dr. Willis, Carr's behavior demonstrated that he understood right from wrong both morally and legally.

Dr. Willis further opined that Carr was capable of distinguishing moral right from wrong during his commission of the assault on R.D.  She explained that Carr took acts to avoid detection, including:  playing loud music to prevent anyone from hearing R.D. scream, covering the windows, duct taping R.D.'s mouth shut to silence her, removing the keys from the deadbolt locks on the door, wrapping R.D.'s head injury to address her bleeding, and dissuading R.D. from reporting the assault.

19.

Dr. Willis explained that although Carr may have been motivated, during some of the incidents, by persecutory delusions that people were coming into the house to have sex with S.Y., these delusions were fueled by jealously and methamphetamine, and not a morally righteous purpose. She acknowledged however that if someone felt justified in their actions, they may view their behavior as morally right.

***Expert Opinions as to Whether Carr's Sanity Had Been Restored (§ 1026.2)***

In circumstances where there is a mixed verdict, including, a finding of guilt and sanity as to some counts, but a finding of not guilty by reason of insanity as to others, the court must commit the defendant to the state mental hospital for treatment before the defendant begins serving his or her prison sentence, unless it finds the defendant has been fully restored to sanity.

In determining whether Carr had been restored to sanity, the trial court considered the opinions of four experts:

### 1. The Defense Experts

Dr. Mary Gable and Dr. Patricia Santy, experts retained by trial counsel, opined that Carr was presently legally insane. Dr. Gable's report stated that Carr's conditions "require intensive and ongoing mental health treatment."

Dr. Santy observed that Carr had voiced suicidal ideation in 2019, but these feelings subsided after Carr was able to create a trust fund for his children. Dr. Santy concluded that Carr "remains persistently psychotic and delusional and because of a defect in reality testing he is unable to realize that his behaviors are legally or morally wrong. He therefore remains LEGALLY INSANE and has NOT experienced a return to sanity." (Unnecessary emphasis omitted.)

### 2. The Court-Appointed Experts

On August 31, 2021, the court appointed Dr. Doriann Hughes and Dr. Tamar Kenworthy to evaluate Carr's sanity. Both Dr. Hughes and Dr. Kenworthy concluded that Carr was presently insane.

20.

In her report, Dr. Hughes noted that Carr had experienced suicidal ideation following a court appearance in 2019. However, Carr stated that his suicidal thoughts had subsided after he had hired an attorney to set aside money for his children. Following her evaluation, Dr. Hughes opined that Carr "ha[d] not improved to such an extent that he is no longer a danger to the health and safety of others," and that he "should be committed to a treatment facility." (Unnecessary emphasis omitted.)

Dr. Kenworthy offered a similar opinion, finding that "Mr. Carr has not improved in his symptoms, he continues to pose a danger to others, and it is recommended that he be required to undergo treatment in an inpatient treatment facility." (Unnecessary emphasis omitted.)

### Dr. Seymour's Competency Evaluation (§ 1370.1)

On February 3, 2021, Dr. Harold Seymour, a clinical psychologist, was appointed by the trial court to evaluate Carr to determine whether he had been restored to sanity (§ 1026.2). However, the trial court's order erroneously instructed Dr. Seymour to evaluate Carr to determine whether he was competent to stand trial (§ 1370.1).

Dr. Seymour interviewed Carr on February 18, 2021. In his report, Dr. Seymour stated that Carr was "quite aware of his legal situation," and "[h]e was able to describe his desire to use the sentencing process to alter his placement from prison to a hospital." Dr. Seymour observed that Carr did not exhibit delusional or bizarre thinking, he denied experiencing current hallucinations or suicidal ideation, and his thought process was "generally linear and concrete."

Following his evaluation, Dr. Seymour recommended that Carr "be found competent to proceed with his criminal case and sentencing." (Unnecessary emphasis omitted.)

Trial counsel objected to admission of Dr. Seymour's report, explaining that "[c]ompetence has never been an issue in this case." Although Dr. Seymour added a one-page addendum to his report to include an evaluation of whether Carr was presently sane,

the parties, the court, and Dr. Seymour agreed that his opinion as to Carr's present sanity should ultimately not be considered given the circumstances.

## DISCUSSION

### I. Ineffective Assistance of Counsel Claims

Carr alleges numerous instances of ineffective assistance of counsel, specifically that trial counsel was ineffective for: (1) not picking up and timely reviewing discovery consisting of Licensed Clinical Social Worker (LCSW) Natalie Arballo's report; (2) not adequately preparing expert witnesses Dr. Kim and Dr. Hedberg to testify; (3) requesting a bench trial on the charges upon which a mistrial was declared, and (4) not requesting a section 1368 competency evaluation despite two experts' opinions (Dr. Kim and Dr. Howsepian) that Carr was insane and evidence documenting Carr's substantial psychiatric history.

To prevail on a claim of ineffective assistance of counsel, Carr is required to make a two-part showing. First, he must establish that "counsel's representation fell below an objective standard of reasonableness under prevailing professional norms." (*People v. Kelly* (1992) 1 Cal.4th 495, 519-520.) Second, he must show that trial counsel's deficient performance was prejudicial. (*Ibid*.) Prejudice must be affirmatively shown; the record must demonstrate "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." (*Strickland v. Washington* (1984) 466 U.S. 668, 694.)

It is settled that if the record reveals that an appellant has not suffered prejudice, we may resolve a claim of ineffective assistance of counsel on that basis alone. (*Strickland*, *supra*, 466 U.S. at p. 697.) With respect to Carr's first three claims, we conclude that he has failed to show prejudice from any presumed error. Our reasoning is set forth fully below. As to Carr's fourth claim, that trial counsel was constitutionally

22.

ineffective for failing to declare a doubt as to Carr's competence to stand trial, we address his claim separately in part II, *post*.

### A. Failure to Pick Up and Timely Review Discovery

Arballo, the LCSW, performed a 5150 evaluation of Carr following his attack on the gardeners. During trial, counsel objected to the admission of Arballo's testimony, asserting the prosecutor had not provided Arballo's report to him. The prosecutor stated that the report had been provided to trial counsel months prior to Carr's trial. The trial court remedied the issue by recalling Arballo to the stand one day after her testimony on direct examination, so that trial counsel could cross-examine Arballo after reviewing her report.

Carr maintains that this remedy was inadequate because it did not provide trial counsel with adequate time to confer with his experts to assess what effect, if any, Arballo's report had on Carr's defense of not guilty by reason of insanity. Carr further contends that Arballo's report contained inaccuracies because it stated Carr "ha[d] no documented or reported psychiatric history."

Carr acknowledges that he was ultimately found not guilty by reason of insanity for the charges resulting from his attack on the gardeners. He fails to direct us to competent evidence within the record from which we could conclude that he was prejudiced by trial counsel's failure to review Arballo's report prior to trial. Carr's failure to show prejudice is fatal to his claim.

### B. Failure to Prepare an Expert Witness; Failing to Provide Experts Relevant Materials

Carr submits that trial counsel failed to adequately prepare his experts to testify by (1) failing to discuss Dr. Kim's findings in preparation for her testimony as an expert, as well as the procedures applicable to expert witnesses in Fresno County; and (2) failing to provide Dr. Hedberg with police reports of the criminal incidents with which Carr was

charged, and failing to provide Dr. Kim with a copy of the Ring Doorbell video of the domestic violence incident involving S.Y. We find his claims unpersuasive.

We do not know what discussions occurred between trial counsel and Dr. Kim prior to her testimony at the 402 hearing, nor is it clear what quantum of preparation a competent attorney would be required to conduct under the circumstances. However, the record shows Dr. Kim was an experienced clinical psychologist who had previously testified as an expert witness on section 1026 evaluations and should therefore expect to have her opinion tested by the crucible of cross-examination.

Even if we were to presume error, Carr's assertion of prejudice is entirely too speculative to support his claim of ineffective assistance of counsel. Insofar as the trial court concluded that Dr. Kim was not qualified to testify, based upon her responses to the prosecutor's vigorous cross-examination, her testimony may have been more damaging than helpful had the jury heard it. And, while the trial court heard her testimony at the in limine hearing, there is no affirmative indication that Dr. Kim's testimony was considered by the trial court in reaching a verdict at Carr's retrial. Carr's assertion to the contrary is not supported by the record.

With respect to Carr's claim that trial counsel failed to provide his experts with the Ring Doorbell video depicting the domestic violence incident or police reports documenting all three crimes, Dr. Kim and Dr. Hedberg testified that their opinions would not change if they had this evidence. The important consideration, as Dr. Hedberg explained, was Carr's explanation for and view of the incidents. Dr. Kim made a similar representation, explaining that "those isolated bits of information and data, don't really address what's underlying for Mr. Carr," which are that his persistent delusions "are the underlying basis for his actions."

We further observe that Dr. Hedberg testified that he learned of the underlying basis for the charged offenses from the other experts' reports. And, Dr. Kim stated that she had read the police reports from the underlying criminal incidents. We have no

24.

reason to believe that either Dr. Hedberg or Dr. Kim did not have critical facts that would have made a difference to their opinions. Moreover, we can only speculate as to whether the jury or trial court would have found their opinions more persuasive had they been supplied with the missing evidence. (*People v. Karis* (1988) 46 Cal.3d 612, 656 [" 'The burden of sustaining a charge of inadequate or ineffective representation is upon the defendant. The proof ... must be a demonstrable reality and not a speculative matter' "].) Consequently, any presumed error is not demonstrably prejudicial upon the record.

### C. Waiver of a Jury Trial on the Mistried Counts

Carr contends trial counsel was constitutionally ineffective for requesting a court trial on the counts upon which a mistrial was declared. Trial counsel advised Carr to waive his right to a jury trial because, based upon his research, "every single case [counsel] saw where there was a hung jury on the issue of legal sanity, the next trial was also a hung jury, and [he could therefore] predict with 99 percent certainty that would be the outcome of any future trial if there were a jury."

In our view, this was a tactical decision which is entitled to deference on appeal. (*Wiggins v. Smith* (2003) 539 U.S. 510, 521 [trial counsel's strategic choices made after a thorough investigation of the law and the facts relevant to plausible options are virtually unchallengeable on a claim of ineffective assistance of counsel].) Although Carr suggests that a mistrial was a preferable outcome, he does not explain why that is so. Carr admitted his guilt to the underlying offenses. The burden of persuasion remained on him to prove, by a preponderance of the evidence, that he was not guilty because of his insanity. (See *In re Franklin* (1972) 7 Cal.3d 126, 141.)

Carr nonetheless contends there is no strategic reason why he would waive the right to a jury trial on the counts upon which a mistrial was declared. According to Carr, the trial court made comments demonstrating an aversion to his insanity defense. Carr points to the following to support his claim: (1) the trial court's comments finding Carr unsuitable for pretrial mental health diversion because he poses an unreasonable risk of

25.

danger to public safety (§ 1001.36, subd. (c)(4)); (2) the court's comments stating that Dr. Kim's opinion that Carr was " 'still insane,' " made no sense and did not comport to the elements of section 1026; and (3) the court's response to Carr after Carr made an unsolicited comment to the court.**4**

None of the statements Carr directs us to, considered individually or together, support his claim that the trial court found his insanity claim unpersuasive. Nonetheless, we reject Carr's claims for two reasons.

First, Carr personally waived his right to a jury trial; trial counsel did not waive the right on his behalf. Although Carr suggests that trial counsel ultimately made this decision, the instant case does not show that he lacked the capacity to make a knowing and voluntary waiver. (See generally, *People v. Blackburn* (2015) 61 Cal.4th 1113, 1130 [unless the defendant lacks the capacity to make a knowing and voluntary waiver, control of the decision to waive the right to a jury trial belongs to the defendant]; accord, *People v. Tran* (2015) 61 Cal.4th 1160, 1167.)

Second, insofar as Carr contends his trial counsel improperly advised him to waive his right to a jury trial, there is no guarantee that Carr's witnesses would have been available to testify at any future jury trial. We therefore cannot know, with certainty,

---

**4**    The comment was as follows:

"THE COURT:  All right.  We are now outside the presence of the jurors.  We earlier had Dr. Kim during the course of our 402 regarding the foundation for her to testify, and during that, the Court made the comment about having observed Mr. Carr's interactions with court staff.  I did not clarify exactly what I meant, and I want to do that now.  What I meant was he's been a perfect gentleman.  He has not exhibited anything, um, out of the ordinary.  He's been actually one of the better behaved individuals in my court during this entire trial.

"THE DEFENDANT:  Well, I don't think you slept with my old lady.

"THE COURT:  Sir, I didn't request a comment.  I just wanted to clarify for the record."

26.

what evidence would have been presented at a future jury trial. But even if we were to presume Carr would have presented identical evidence at a future jury trial, we can only speculate what persuasive value a reasonable jury would have attached to such evidence. We therefore cannot determine whether a more favorable outcome would likely have resulted had Carr not been advised to waive his right to a jury trial. (*Strickland, supra*, 466 U.S. at pp. 693, 694.)

## II.     Failure to Declare a Doubt as to Carr's Competency (§ 1368)

Carr contends that trial counsel was constitutionally ineffective for failing to investigate his competency. According to Carr, Dr. Howsepian's report and Dr. Kim's testimony, in addition to Carr's psychiatric history, should have put trial counsel on notice that Carr was not competent to stand trial. He further contends that the trial court abused its discretion in failing to conduct a competency inquiry because there was substantial evidence of his incompetence. We disagree.

### A.     Background

#### 1.     *The Experts Opinions*

During an in limine hearing, Dr. Kim opined that Carr was insane at the time of the charged offenses, and that he was "still insane." She explained that Carr was unable to understand that his actions were morally wrong because his behaviors were predicated upon delusions.

Dr. Kim's notes from her evaluation reference the elements of "Penal Code section 1368 mental competency" because she uses the same outline for every evaluation she performs, whether the case is civil, criminal, or otherwise. She acknowledged that a section 1368 evaluation for competency and a section 1026 evaluation for legal insanity were different evaluations, and that she was asked to make an evaluation for sanity, not competency.

Dr. Kim explained that an evaluation under section 1368 requires an expert to opine whether an "individual is competent, understands what the charges are, understands

27.

the court proceedings, … can work with Counsel in a rational manner, and if they can't … whether they can do it themselves and to be found whether they're trial competent." She did not opine that, applying this standard, Carr was incompetent.

Dr. Howsepian similarly opined that Carr was insane at the time of the charged offenses and "is still psychotic." (Italics omitted.) His report states, in part, that Carr currently suffers from an "unmedicated psychotic mental disorder … dominated by paranoid delusions, with … occasional auditory hallucinations, in addition to a Personality Change due to Traumatic Brain Injury." However, like Dr. Kim, Dr. Howsepian did not opine that Carr was incompetent to stand trial. With the exception of Dr. Seymour, none of the experts evaluated Carr for competency, nor did they offer an opinion as to Carr's competency.

Dr. Seymour, the lone expert who conducted a competency evaluation, concluded that Carr is "quite aware of his legal situation," he is "able to describe his desire to use the sentencing process to alter his placement from prison to a hospital." Following his evaluation, Dr. Seymour opined that Carr was competent to proceed with his criminal case.

### 2.    *Trial Counsel's Observations*

During a pretrial hearing on January 6, 2020, the parties discussed the admissibility of a recorded phone call Carr placed from jail to his mother. During the phone call, which occurred several days after the third incident, Carr made statements about the crimes with which he was charged, and he expressed concern about losing his kids, in part, because of his actions. Carr also told his mother that trial counsel thought Carr was competent.

Trial counsel confirmed that he did in fact make this representation and expressed concern that if the jury heard this statement, it would not be able to draw a distinction between "competent" and "sane," which was the ultimate issue at trial. The trial court excluded admission of evidence of the recorded jail phone call, in part, on this basis.

### 3. *Carr's In-Court Behavior/the Trial Court's Observations*

Carr did not testify at his criminal trial. His statements on the record were brief. Although he made one statement suggesting that he still possessed the delusional belief the some of the victims had been sleeping with his wife, his responses to the court's questions and his statements at sentencing were otherwise appropriate and intelligible. Nothing within the record suggests that he exhibited abnormal or bizarre behavior in court.

Following Dr. Kim's testimony wherein she opined that Carr was still insane, the trial court commented, "I'm looking right at [Carr], and just his interactions with my court staff, with my deputies, with Counsel, um, it just makes no sense."[5] The court subsequently added, Carr had been well-behaved throughout his trial and had not exhibited any behavior that was out of the ordinary. The court stated, "He's been actually one of the better behaved individuals in my court during this entire trial."

### B. Relevant Legal Principles

A criminal defendant may not be tried while mentally incompetent. (U.S. Const., 14th Amend.; § 1367, subd. (a); *People v. Ary* (2011) 51 Cal.4th 510, 517.) "It has long been established that the conviction of an accused person while he is legally incompetent violates due process. [Citation.] Indeed, the United States Supreme Court has held that the failure of a trial court to employ procedures to protect against trial of an incompetent defendant deprives the defendant of his due process right to a fair trial and requires reversal of his conviction." (*People v. Hale* (1988) 44 Cal.3d 531, 539, fn. omitted.)

Mental competence requires ability to understand the nature of the criminal proceedings and to assist counsel in the conduct of a defense in a rational manner.

---

[5] From the experts' testimony, it is clear that Dr. Kim was not opining that Carr was incompetent. She was opining that Carr was still insane, meaning that he believed his actions were morally justified based upon his delusions.

(§ 1367, subd. (a); *People v. Mendoza* (2016) 62 Cal.4th 856, 871.) "*M'Naghten*[6] insanity is immaterial." (*People v. Pennington* (1967) 66 Cal.2d 508, 516.)

A defendant is presumed to be mentally competent to stand trial. (§ 1369, subd. (f).) However, the trial court is obliged to conduct a competency hearing when the defendant presents substantial evidence of incompetence; that is, " 'evidence from which a reasonable jurist would entertain a bona fide doubt concerning competency' " (*People v. Mendoza*, *supra,* 62 Cal.4th at pp. 884-885.) The court must conduct a hearing when such evidence is presented at any time prior to judgment. (*People v. Jones* (1991) 53 Cal.3d 1115, 1153.)

On review, we determine whether, as a matter of law, the evidence raised a reasonable doubt as to Carr's mental competence, considering all relevant facts in the record. (*People v. Young* (2005) 34 Cal.4th 1149, 1217.) "A trial court's decision whether or not to hold a competence hearing is entitled to deference, because the court has the opportunity to observe the defendant during trial." (*People v. Rogers* (2006) 39 Cal.4th 826, 847.) An appellate court is generally not in a position to appraise a defendant's conduct in the trial court as indicating insanity, a calculated attempt to feign insanity and delay the proceedings, or sheer temper. (*People v. Marshall* (1997) 15 Cal.4th 1, 33.)

### C. Analysis

### 1. *Trial Counsel's Failure to Declare a Doubt*

Carr contends trial counsel rendered ineffective assistance of counsel for failing to declare a doubt as to his competency to stand trial. We reject his claim for two reasons.

---

**6** "Under *M'Naghten*, insanity is established if the defendant was unable either to understand the nature and quality of the criminal act, or to distinguish right from wrong when the act was committed." (*People v. Elmore* (2014) 59 Cal.4th 121, 140, citing § 25, subd. (b).)

First, as discussed further below, there was not substantial evidence showing Carr was incompetent to stand trial. Consequently, any doubt trial counsel may have declared would not have been sufficient to initiate a competency inquiry by the court.

" 'Counsel's assertion of a belief in a client's incompetence is entitled to some weight. But unless the court itself has declared a doubt as to the defendant's competence, and has asked for counsel's opinion on the subject, counsel's assertions that his or her client is or may be incompetent does not, in the absence of substantial evidence to that effect, require the court to hold a competency hearing.' " (*People v. Sattiewhite* (2014) 59 Cal.4th 446, 465; see *People v. Garcia* (2008) 159 Cal.App.4th 163, 170 [declaration of doubt by counsel or anyone other than trial court insufficient to trigger statutory right to competency hearing]; see, e.g. *People v. Hines* (2020) 58 Cal.App.5th 583 [psychiatrist's opinion and defense counsel's declaration of doubt about defendant's competence were insufficient to trigger competency hearing where defendant's condition was not linked to his ability to understand proceedings or assist at trial].)

Second, trial counsel represented in a jail phone call to Carr's mother that Carr was competent, and during a discussion about Dr. Seymour's report, he insisted that competency was not an issue at trial. Under the circumstances, we see no reason why trial counsel would be required to declare a doubt as to Carr's competency.

Carr submits that he was unable to assist in his own defense because his perception of reality was distorted by his continued belief in his delusions concerning S.Y. We have no doubt that a fixed delusion can interfere with a defendant's ability to assist in his own defense. However, Carr does not explain how that was the case here, where his asserted defense was legal insanity, which was tied to his delusional beliefs.

Although the record contains considerable evidence that Carr had a history of mental health issues, there is insufficient evidence showing that he was unable to communicate effectively with trial counsel, to assist rationally in his defense, or to understand the nature of the proceedings against him. (*People v. Hines*, *supra*, 58

31.

Cal.App.5th at p. 608 ["the critical question is not whether a defendant has a mental illness that *may* impair his ability to assist in his defense, but whether the evidence supports a reasonable doubt about his ability to understand the proceedings and participate rationally in his defense].) We conclude that Carr's assertion that trial counsel rendered ineffective assistance of counsel by failing to declare a doubt as to his competency is unpersuasive.

### 2.  *The Trial Court's Failure to Declare a Doubt as to Carr's Competency*

Carr further contends that he was denied due process by the trial court's failure to order a competency hearing. He submits that evidence presented in the context of Carr's motion for pretrial diversion, including Dr. Howsepian's report and testimony; Dr. Kim's testimony at the in limine hearing; and the experts' section 1026.2 sanity evaluations, constitute substantial evidence showing that he was incompetent to stand trial.

We conclude that the evidence relevant to Carr's sanity did not constitute substantial evidence of his incompetence to stand trial. The trial court did not err by failing to declare a doubt about Carr's competency and by failing to conduct a hearing.

### A.  Relevant Legal Principles

"A defendant is incompetent to stand trial if he or she lacks a ' "sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding— and ... a rational as well as a factual understanding of the proceedings against him." ' " (*People v. Rogers*, *supra*, 39 Cal.4th at pp. 846-847, quoting *Dusky v. United States* (1960) 362 U.S. 402.) This standard is codified by subdivision (a) of section 1367, which prohibits criminal proceedings against a defendant who "as a result of mental health disorder or developmental disability ... is unable to understand the nature of the criminal proceedings or to assist counsel in the conduct of a defense in a rational manner." "[T]the United States Supreme Court has held that the failure of a trial court to employ procedures to protect against trial of an incompetent defendant deprives the

defendant of his due process right to a fair trial and requires reversal of his conviction." (*People v. Hale, supra,* 44 Cal.3d at p. 539.)

The obligation to initiate competency proceedings "is triggered whenever ' "the court is presented with substantial evidence of incompetence, that is, evidence that raises a reasonable or bona fide doubt concerning the defendant's competence to stand trial." ' " (*People v. Parker* (2022) 13 Cal.5th 1, 28, quoting *People v. Johnson* (2018) 6 Cal.5th 541, 575.) "Evidence of incompetence may emanate from several sources, including the defendant's demeanor, irrational behavior, and prior mental evaluations." (*People v. Rogers, supra*, 39 Cal.4th at p. 847.) "[E]ven one … factor[] standing alone may, in some circumstances, be sufficient. There are, of course, no fixed or immutable signs which invariably indicate the need for further inquiry to determine fitness to proceed; the question is often a difficult one in which a wide range of manifestations and subtle nuances are implicated." (*Drope v. Missouri* (1975) 420 U.S. 162, 180.)

However, "the evidence must bear on the defendant's competency to stand trial, rather than simply establish the existence of a mental illness that could conceivably affect his ability to understand the proceedings or assist counsel." (*People v. Ghobrial* (2018) 5 Cal.5th 250, 270; *People v. Ramos* (2004) 34 Cal.4th 494, 508; *People v. Sattiewhite*, *supra,* 59 Cal.4th at pp. 464-465, quoting *People v. Rogers* (2006) 39 Cal.4th 826, 847 [" 'to be entitled to a competency hearing, "a defendant must exhibit more than bizarre ... behavior, strange words, or a preexisting psychiatric condition that has little bearing on the question of whether the defendant can assist his defense counsel" ' "].) "Competence to stand trial requires 'the mental acuity to see, hear and digest the evidence, and the ability to communicate with counsel in helping prepare an effective defense.' " (*People v. Johnson, supra,* 21 Cal.App.5th at p. 276, citing *Odle v. Woodford* (9th Cir. 2001) 238 F.3d 1084, 1089.)

"Once such substantial evidence appears, a doubt as to the sanity of the accused exists, no matter how persuasive other evidence—testimony of prosecution witnesses or

the court's own observations of the accused—may be to the contrary." (*People v. Pennington*, *supra*, 66 Cal.2d at p. 518, discussing *Pate v. Robinson* (1966) 383 U.S. 375, 385-386.) "[w]hen faced with conflicting evidence regarding competence, the trial court's role under Penal Code section 1368 is only to decide whether the evidence of incompetence is substantial, not to resolve the conflict. Resolution must await expert examination and the opportunity for a full evidentiary hearing." (*People v. Rodas* (2018) 6 Cal.5th 219, *234*.)

### B.  Analysis

In *People v. Pennington, supra,* 66 Cal.2d 508, our Supreme Court, drawing from *Pate v. Robinson*, set forth the standard for what may constitute substantial evidence of incompetence to stand trial: "If a psychiatrist or qualified psychologist [citation], who has had sufficient opportunity to examine the accused, states under oath with particularity that in his professional opinion the accused is, because of mental illness, incapable of understanding the purpose or nature of the criminal proceedings being taken against him or is incapable of assisting in his defense or cooperating with counsel, the substantial-evidence test is satisfied." (*People v. Pennington,* at p. 519.) Here, none of the experts offered testimony which would satisfy the *Pennington-Pate* test for substantial evidence.

Dr. Kim and Dr. Howsepian testified that Carr was legally insane during the commission of his crimes. Dr. Kim further opined that Carr was still insane." Dr. Kim explained that Carr suffered from paranoid delusions which prohibited him from understanding right from wrong, morally. Dr. Howsepian opined that Carr's delusions were caused by either a delusional disorder, schizophrenia, or a settled psychosis caused by a history of methamphetamine use. In his report, he concluded that Carr is "still psychotic."

Neither Dr. Kim nor Dr. Howsepian opined that Carr was incompetent to stand trial, nor were they asked to evaluate Carr for competency. Similarly, while all four experts who evaluated Carr for sanity prior to his sentencing hearing concluded that he

34.

had not been restored to sanity, none of the experts related their findings in terms of his competency.

In short, none of the experts offered testimony supporting the conclusion that as a result of a mental disorder, Carr lacked the "ability to consult with his lawyer with a reasonable degree of rational understanding" or "a rational as well as factual understanding of the proceedings against him." (*Dusky v. United States, supra,* 362 U.S. 402.) Their opinions were limited to the issue of Carr's sanity. The determination of whether a defendant is legally insane is distinct from whether the defendant is competent to stand trial. As Dr. Kim acknowledged, "[t]hey're different questions."

Further, although Carr experienced delusions of jealously and persecution, apart from emphasizing that these delusions where unshakeable, he has not explained how his delusions or his mental health disorder rendered him unable to understand the proceedings or to rationally assist with his own defense. (See, e.g., *People v. Stankewitz* (1982) 32 Cal.3d 80, 92-93 [the defendant's paranoid delusions that his court-appointed attorney was colluding with the prosecution was sufficient evidence of incompetence such that the trial court should have held a hearing]; *People v. Melissakis* (1976) 56 Cal.App.3d 52, 60-61 [psychiatrist's opinion that the defendant was incapable of trusting another person sufficiently to present an adequate defense, in addition to the defendant's request for substitution of counsel, and his testimony illustrating that he was suffering from a delusion which could interfere with his ability to assist with his defense, constituted substantial evidence of incompetency]; *People v. Aparicio* (1952) 38 Cal.2d 565, 569 [defendant's conduct at the time of his trial, including his refusal to confer with his public defender, indicated he lacked sanity]; *People v. Humphrey* (1975) 45 Cal.App.3d 32, 38 [finding the defendant, a paranoid schizophrenic, lacked present sanity where, among other factors, he was unable to participate or cooperate in psychological testing].)

The record leaves no doubt that Carr had a significant history of mental health issues, including: a traumatic injury to his brain, a history of psychiatric hospitalizations as a minor, and a mental health disorder, the symptoms of which were exacerbated by his use of methamphetamines. Notwithstanding, the record does not contain substantial evidence showing that Carr was incompetent to stand trial or to be sentenced. (*People v. Laudermilk* (1967) 67 C.2d 272, 285 ["more is required to raise a doubt [of competence] than mere bizarre actions [citation] or bizarre statements [citation] ... or psychiatric testimony that defendant is immature, dangerous, psychopathic, or homicidal or such diagnosis with little reference to defendant's ability to assist in his own defense"].)

To the contrary, the balance of the evidence suggests that Carr was competent. Trial counsel represented that Carr was competent, an opinion which he maintained throughout Carr's trial. Trial counsel's opinion was consistent with Dr. Seymour's opinion following a competency evaluation. Further, the trial court rejected Dr. Kim's testimony opining that Carr was "still insane," explaining that Dr. Kim's testimony made no sense in light of its observations of Carr. (*People v. Ramos*, *supra*, 34 Cal.4th at p. 509 ["[a]lthough a court may not rely solely on its observations of a defendant in the courtroom if there is substantial evidence of incompetence, the court's observations and objective opinion do become important when no substantial evidence exists that the defendant is less than competent to plead guilty or stand trial"].)

The time of the trial is the only time period relevant to a defendant's competence to stand trial. (*People v. Acosta* (1971) 18 Cal.App.3d 895, 900.) Because there was insufficient evidence showing that Carr was incompetent to stand trial, the trial court did not err by failing to initiate a competency inquiry.

## III. The Trial Court's Refusal to Readback Requested Testimony Prior to Declaring a Mistrial and the Jurors Reliance Upon Notes

Carr argues the trial court reversibly erred by (1) declaring a mistrial prior to honoring the jury's request for a readback of testimony, and (2) by allowing the jury to

rely upon their notes, rather than a readback of the testimony, during deliberations.  We conclude that Carr has failed to demonstrate reversible error.

### A.  Background

On Friday, January 24, 2020, the jury asked for a readback of the experts' testimony.

On Monday, January 27, 2020, the jury foreperson sent the court a note stating that the jury had reached a verdict on two of the counts, but was hung on the remaining 12 counts.  The jury had not heard a read back of the experts' testimony.  That morning, the court reporter attempted to provide the jurors with a read back of the testimony requested, but the jury declined to hear it.

The jury foreperson explained, the jury intended to hear the readback "but we began talking as soon as we got here this morning, and the conversation was more lively and participated in than it had been up to that point … [a]nd so we continued to talk, and one of the reasons for asking for the read back was just an affirmation of certain things that people had written in notes, and I think we did that amongst ourselves."

The trial court asked the foreperson whether "is there even an outside chance that by listening to the testimony it may assist you at all?"  The foreperson responded, "I don't believe so."  The court asked each juror individually whether that was their personal opinion as well.  In so doing, the court clarified at least twice whether "further deliberations," "jury instructions," "or [a] reading of testimony" would assist the jurors in reaching a verdict.  The jurors agreed that a readback would not assist them.

After polling the jury, the court declared a mistrial on all 12 counts upon which the jury had deadlocked.  The jury found Carr sane on counts 6 and 7.

### B.  Analysis

#### 1.  *Jury's Request for Read Back of Expert Testimony*

Under section 1138, the jury has the right to hear a readback of requested testimony or jury instructions.  As the Attorney General correctly observes, the jury also

has the right to change their mind about such a request, which is precisely what occurred here. The trial court confirmed with the jury foreperson and the jurors individually whether a readback of the experts' testimony would assist them with their deliberations. They agreed that a readback would not. We see no reason why the jury should be forced to hear testimony that they no longer needed to hear. We find no error, nor prejudice assuming error, under the circumstances.

## 2. *Use of Trial Notes by Jury*

Notetaking by jurors is implicitly authorized by statute. Section 1137 provides, " [u]pon retiring for deliberation, the jury may take with them all papers (except depositions) which have been received as evidence in the cause, or copies of such public records or private documents given in evidence as ought not, in the opinion of the court, to be taken from the person having them in possession. They may also take with them the written instructions given, and notes of the testimony or other proceedings on the trial, taken by themselves or any of them, but none taken by any other person. The court shall provide for the custody and safekeeping of such items."

At the commencement of trial, the jury was instructed that it could take notes during the trial and use notes during deliberations, but that the court reporter's record "must guide your deliberations, not your notes." Carr contends the jury foreperson's comments to the court indicate that the jurors improperly and prejudicially relied upon their notes during deliberations. He submits that the trial court erred by not insisting that the jury hear the requested testimony readback when the foreperson stated that the juror's had referred to their notes to clarify an unspecified point.

From the available record, we have no way of knowing what specific issue motivated the jury to request a readback of the experts' testimony. We therefore do not know what significance the jurors' notes had on their own deliberative process, whether the jurors relied upon their notes in place of their independent recollection of the evidence, or whether the jurors discussed the content of their notes amongst one another.

38.

Because Carr failed to raise this issue below, the record is undeveloped. (See generally, *People v. Cline* (1963) 222 Cal.App.2d 597, 601 [if any error occurred by the jury's use of notepads, "it was the duty of defendant to draw the court's attention to it and have a record made of it"].) Because Carr cannot show prejudice, we reject his claim. (*People v. Ghent* (1987) 43 Cal.3d 739, 758 ["[w]e cannot presume prejudice in the face of such a silent record"].)

## IV.    Carr is Entitled to a Resentencing Hearing

Carr contends the case at bench must be remanded for resentencing because Assembly Bill No. 124 (2021-2022 Reg. Sess.), enacted after his November 2021 sentencing hearing, amended section 1170 to make the low term the presumptive sentence where a defendant has experienced "psychological, physical, or childhood trauma, including, but not limited to, abuse, neglect, exploitation, or sexual violence" that was "a contributing factor in the commission of the offense." (Stats. 2021, ch. 731, § 1.1; § 1170, subd. (b)(6)(A).) Carr asserts that evidence of his history of psychiatric issues constitutes evidence of "childhood trauma," and that he is entitled to resentencing under newly enacted Assembly Bill No. 124. He further contends that Senate Bill No. 567's amendment to section 1170, subdivision (b) also entitles him to resentencing.

The Attorney General concedes that resentencing is required under Senate Bill No. 567. Following the enactment of Senate Bill No. 567, an upper term sentence may be imposed only where the facts underlying all of the aggravating circumstances have been stipulated to by the defendant or are found true beyond a reasonable doubt by a jury or court trial. (§ 1170, subd. (b)(1), (2).) The trial court did not comply with Senate Bill No. 567, which had not yet gone into effect at the time of Carr's sentencing hearing. Moreover, the Attorney General submits that he is unable to make a good-faith argument for harmless error based upon the existing record.

We accept the Attorney General's concession and will therefore vacate Carr's sentence and remand the matter back to the trial court for resentencing. In light of our

conclusion that resentencing is required by Senate Bill No. 567, Carr's claim that he is entitled to resentencing under Assembly Bill No. 124 is moot. Any argument pertaining to the effect of Assembly Bill No. 124 on Carr's sentence may be raised by trial counsel at the resentencing hearing below.

## A. The Sentencing Hearing

At the sentencing hearing, the parties discussed Carr's mental health issues. The prosecutor acknowledged that Carr's mental health issues must be taken into consideration (see Cal. Rules of Court, rule 4.423(b)(2)), but argued that Carr's condition does not reduce his culpability. The prosecutor explained that some of Carr's crimes, specifically the attack on R.D., involved planning, witness dissuasion, and violence that had resulted in extreme injury to the victim. Additionally, the prosecutor represented that Carr posed a threat of danger to the public safety.

Trial counsel emphasized that Carr suffered a traumatic frontal lobe brain injury when he was five years old as a result of an automobile accident. Four of the experts that had examined Carr agreed that this brain injury had affected him psychologically, and one opined that "Carr will never be what we consider to be normal." Trial counsel agreed that Carr would be a threat to the public safety if he were released, but he was not asking for release.

Carr addressed the court at his sentencing hearing. He explained that throughout the entirety of his youth, from the ages of five to 18, he had been institutionalized. As a result, he rejected restrictions placed upon him as an adult. Carr expressed remorse for his actions, and disappointment that so much had to transpire before he realized that he has problems. He added that his mistakes and poor decisions do not define him.

The trial court observed numerous factors in aggravation of Carr's sentence, including, the fact that one of the crimes involved great violence resulting in extreme injuries, specifically, the attack on R.D. The court further found that Carr had planned

the attack on R.D. and that he was in a position of trust because R.D. was a loyal friend to Carr.

With respect to factors pertaining to Carr himself, the court found evidence of multiple prior convictions increasing in seriousness, that he had served a prison term, and his prior performance on parole and probation had been unsatisfactory. Additionally, the court considered the fact that Carr had hogtied R.D. to be a factor in aggravation. (See Cal. Rules of Court, rule 4.421(c) [authorizing the court to consider "[a]ny other factors statutorily declared to be circumstances in aggravation which reasonably relate to the defendant or the circumstances under which the crime was committed"].) The court concluded that the factors in aggravation greatly outweighed the sole mitigating factor of Carr's brain injury.

### B.     Senate Bill No. 567

Effective January 1, 2022, Senate Bill No. 567 amended section 1170, subdivision (b) to make the middle term the presumptive sentence, unless the greater term is justified by aggravating circumstances that were stipulated to or found true beyond a reasonable doubt by a jury or by the court. (§ 1170, subd. (b)(1), (2); Stats. 2021, ch. 731, § 1.3.)

### C.     Analysis

The Attorney General concedes that in light of the subjective nature of the aggravating factors relied upon by the trial court in imposing the upper term on count 4, the record does not provide a clear indication as to how the trial court would have exercised its discretion if it knew that it could not rely upon some factors. We agree.

Appellate courts are split as to how to determine whether a trial court's imposition of an upper term sentence to comply with Senate Bill No. 567 is harmless error. In *People v. Flores* (2022) 75 Cal.App.5th 495 (*Flores*), our colleagues in Division Three of the First Appellate District held that resentencing following Senate Bill No. 567 is not required if the reviewing court can determine beyond a reasonable doubt that the jury

would have found true at least one aggravating circumstance.  (*People v. Flores,* at p. 501.)

In *People v. Lopez* (2022) 78 Cal.App.5th 459 (*Lopez*), Division One of the Fourth Appellate District concluded that harmless error may be found where the reviewing court can either (1) determine beyond a reasonable doubt that the jury would have found true *all* the aggravating factors the trial court cited, or if not, (2) conclude, "to the degree required by *People v. Watson* (1956) 46 Cal.2d 818, 836," that the trial court would have reached the same decision even if it knew it could not properly rely on all the factors it did.  (*Id.* at p. 467, fn. 11.)

In *People v. Dunn* (2022) 81 Cal.App.5th 394, review granted Oct. 12, 2022, S275655 (*Dunn*), this court described a two-step process:  "The reviewing court determines (1)(a) beyond a reasonable doubt whether the jury would have found one aggravating circumstance true beyond a reasonable doubt and (1)(b) whether there is a reasonable probability that the jury would have found any remaining aggravating circumstance(s) true beyond a reasonable doubt.  If all aggravating circumstances relied upon by the trial court would have been proved to the respective standards, any error was harmless.  If not, the reviewing court moves to the second step of *Lopez*, (2) whether there is a reasonable probability that the trial court would have imposed a sentence other than the upper term in light of the aggravating circumstances provable from the record as determined in the prior steps.  If the answer is no, the error was harmless.  If the answer is yes, the reviewing court vacates the sentence and remands for resentencing consistent with section 1170, subdivision (b)."  (*Id.* at pp. 409-410, fn. omitted.)

In *People v. Zabelle* (2022) 80 Cal.App.5th 1098, the Third District described a similar test as that described in *Dunn.*  The reviewing court must:  (1) identify one aggravating factor relied upon by the trial court that would have been found true by the jury beyond a reasonable doubt; and (2) for the remaining factors, determine whether it is reasonably probable that a jury would have found the remaining aggravating factors true.

(*People v. Zabelle*, *supra*, at pp. 1110-1113.) With the aggravating factors that survive, the reviewing court determines "whether it is reasonably probable that the trial court would have chosen a lesser sentence had it considered only these aggravating facts." (*Id*. at p. 1112.)

The question of what prejudice standard applies when a trial court fails to comply with Senate Bill No. 567 is currently pending before our Supreme Court. (See *People v. Lynch* (May 27, 2022, C094174) [nonpub. opn.], review granted Aug. 10, 2022, S274942.) Notwithstanding, we agree with the Attorney General's assertion that under either *Lopez*, *Dunn*, or *Zabelle*, the existing record does not permit us to conclude, with confidence, that the trial court would have imposed the same sentence given the speculative nature of some of the aggravating factors it relied upon in imposing the upper term.[7] (See *People v. Lopez, supra,* 78 Cal.App.5th, 467, fn. 11 [trial court's sentencing error following enactment of Senate Bill No. 567 is not harmless if the reviewing court cannot conclude "to the degree required by [*Watson*]," that the trial court would have reached the same decision even if it knew it could not properly rely on all the factors it did].)

We accept the parties' assertion that resentencing is required. We will therefore remand this matter back to the lower court for that purpose. Although we express no view as to the appropriate sentence, we emphasize that the sentence imposed by the trial court must be stayed pending restoration of Carr's sanity. (See § 1026.2, subd. (m).)

---

**7** We respectfully disagree with the test for harmless error set forth in *Flores*, the most lenient test for harmless error, and therefore decline to apply it here. As amended by Senate Bill No. 567, section 1170, subdivision (b) now provides that the sentencing court may impose an upper term "only when there are circumstances in aggravation of the crime that justify the imposition of a term of imprisonment exceeding the middle term." (§ 1170, subd. (b)(2).) "As a result of this change, it may no longer be true that 'the existence of a single aggravating circumstance is legally sufficient to make the defendant eligible for the upper term.' " (*Flores, supra*, 75 Cal.App.5th at p. 501 [conc. opn. Liu, J.].)

## V.	Cumulative Prejudice

Finally, Carr contends that the prejudice from the totality of the errors he raised on appeal necessitates reversal of his conviction.  For the reasons discussed herein, the record does not support his claims of prejudicial error.

## **DISPOSITION**

The sentence is vacated and the matter is remanded back to the trial court for resentencing.  The judgment of conviction is otherwise affirmed.

SMITH, J.

WE CONCUR:


HILL, P. J.


FRANSON, J.

44.